ANTONIO MARQUES ARBONA, Plaintiff and Appellee, *v.* ANGEL COLÓN ET AL., Defendants and Appellants.

No. 8690. Argued April 8, 1943.—Decided June 8, 1943.

*Luis Mercader* and *Francisco M. Cadilla* for appellants. *Antonio Lens Cuena* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is a suit for revendication. It is alleged in the complaint that the plaintiff is owner of a 7.75–acre estate, located in Hato Abajo, Arecibo; that Francisca Gómez, the ancestor of the defendants, was owner of an adjacent estate the area of which was 19 acres and 2,447.79 meters; that in September 1932 the plaintiff and Francisca Gómez, by mutual agreement, proceeded to settle the boundaries of said estates, using the services of Surveyor Arturo Puig. The estates were surveyed, their boundaries were rectified, and each party remained in possession of his respective estate as reflected by the survey; that after Francisca Gómez died, her heirs, the defendants, took possession of their ancestor's estate, also taking possession, without the consent and over the objection of the plaintiff, of a strip of land of the plaintiff 72.10 meters by 46.46 meters, bounded on the north by a street, on the

south and east by land belonging to the defendants, and on the west by an estate of José Matienzo. And that even though they had been requested to deliver said strip of land to the plaintiff, the defendants have refused to do so, causing him damages in the amount of $1,000.

The defendants filed their answer, generally and specifically denying the facts alleged in the complaint, and alleging as special defenses that the plaintiff is not the sole owner of the 7.75-acre estate; that neither their ancestor nor they effected any settlement of boundaries or entered into any agreement whatsoever with the plaintiff in relation with the estates involved; that the estate with an area of 19 acres and 2,447.79 meters was inherited by the defedants, and other persons, who have not been made party defendants in the suit; that the strip of land that the plaintiff is trying to revendicate is a part of said estate, and has always been in possession of the defendants and their ancestor, as owners of the same, in a quiet, peaceable, and continuous way, and that they allege in their favor the provisions of §1863 in relation with §1859 of the Civil Code.

The issue having thus been joined, the suit went to trial. Both parties introduced evidence, and the court entered judgment against the defendants, stating that the lot claimed by the plaintiff is his property, and that therefore the defendants have to surrender it to him and pay the costs of the suit, including $100 for attorney's fees.

The defendants appealed to this court, assigning eight errors. We will only have to decide the seventh to reverse the judgment. It refers to the one committed by the lower court in weighing the evidence.

The evidence of the plaintiff consisted of a public deed, a map, and the testimony of the plaintiff and of the surveyors Arturo Puig, José R. Lacomba, and Ramón Gelabert, and that of the defendants, of a map, various documents, and the testimony of some witnesses.

In weighing said evidence, the court *a quo* in its opinion and judgment said:

"In 1932 Francisca Gómez was the owner of an estate bounded on the north by another estate belonging to the plaintiff Antonio Marques Arbona. Due to the location of both properties, near the city, they are suitable for urbanization, as the railroad tracks are situated to the east, and the highway to the north, the municipality having also a small interest in adjacent lands.

"With the purpose in mind of determining the correct boundaries of both estates, and of fixing the exact extent of a street that was opened between both urbanizations and that runs along the northern part of Francisca Gómez's estate, they agreed to have a survey, which was done by surveyor Puig, a person worthy of credit, who testified at the trial. The map introduced in evidence by the plaintiff in relation with said testimony, besides what Marques had already testified to, substantially explains what occurred in the settlement of boundaries and the benefit obtained from it by both urbanizations.

"Taking as a basis plaintiff's title, that is, measuring from the highway to the south, we arrived at the conclusion that Marques' property was a good number of square meters short.

"He (Marques) donated 721 meters of his land so that one-half of the street could be built, and as Mrs. Francisca Gómez benefited by the whole street, with land which was not her property, Marques' property had to be extended in its southern boundary by taking a $72 \times 46$ meters rectangle from the northwestern corner of Francisca Gómez's property, to compensate for the survey. Thus things remained, both parties took possession of their respective lots in accordance with the setting of boundaries.

"After the survey was made, Francisca Gómez died, and now the defendants, who are her heirs, refuse to comply with the settlement made by their ancestor, and by their acts detain the possession of the aforementioned rectangle described in the sixth paragraph of the complaint.

"The defendants insist that Francisca Gómez entered into no formal agreement whatsoever with Marques as to the settlement of boundaries. We are convinced by the evidence that, even though Mrs. Gómez was not personally present during the act of the survey, she expressly authorized it and accepted it, and was represented by a person designated by her for that purpose. Everything tends to show that things were done in good faith, and if any technical point was omitted, it must not be an obstacle with respect to a factual

situation which benefited Francisca Gómez's estate, as there is no doubt that the street at the north of the lot is of great value to the urbanization and that it was worth while to permit Marques' estate to extend so as to include the rectangle which is the object of the controversy, as Marques was also sacrificing a good number of square meters so that the street might be a permanent reality.

"It was not necessary to draw a public deed of the result of the survey. The landmarks were varied somewhat, but the settlement of the boundaries was made in accordance with the documents, and Marques obtained by the survey no more land than he had according to this title. In settling boundaries, certain variations are always made to compensate for the missing land. But the title continues being the same as appears from the original public deed. The map drawn becomes a complement of the title, and the landmarks show the possession."

We have carefully examined all the evidence introduced, and in our judgment, it does not justify the conclusions arrived at by the court *a quo*. There is not sufficient evidence to show that the ancestor of the defendants agreed to deliver or give to the plaintiff, as a result of a settlement of boundaries, the lot claimed by him from her heirs. At the most it can be concluded that certain differences having arisen among the owners of the adjacent estates by reason of the construction of a street, they agreed in principle to conduct a survey of said estates with the purpose of settling said differences, but that alone does not mean that any concrete and definite agreement was arrived at as to the delivery of a certain portion of land.

The lot claimed is not included in plaintiff's title. The public deed shows only that the plaintiff acquired a 7.75-acre estate, bounded on the north by the Arecibo–Hatillo Higway, and by the Arecibo–Lares Highway under construction, and on the west by Eduardo Rosso and a lot belonging to the Municipality of Arecibo, on the south by the rest of the principal estate from which the estate was segregated, and on the east by Manuel Olmo and the American Railroad Company, while the lot is bounded on the north by a street, on

the south and east by land belonging to the defendants, and on the west by José Matienzo. In order for this lot to be recorded in the registry of property in the name of the plaintiff, a special title would be required.

And this appears with even greater clearness from the map presented by the plaintiff himself. We are not dealing with a change in boundaries, but with a large lot at the other side of a street within the defendants' estate, with an individual lot separate and different from plaintiff's estate

In order to decide that the plaintiff became the owner of said lot, evidence of its transfer is necessary the same as is required for the acquisition of any real property. There was no public deed. There was no written agreement whatsoever. The only evidence brought was to show that there had been an oral agreement. In order for the same to be sufficient, it would have to be clear, concrete and final, but this was not the case. Let us see.

As we have already stated, the plaintiff himself testified at the trial. Answering his counsel's questions, plaintiff said that, by reason of the construction of a street, a portion on the northern part of his estate had been taken. He complained to Francisca Gómez, owner of the adjacent estate, and "it was agreed that a survey be made of the estate, my estate, and two surveyors were appointed." He appointed Puig. Mrs. Gómez appointed Marrero to represent her, and surveyor Lacomba. "It was agreed that once the boundaries of my lot had been set, as there was a deficiency as to its area, the same would be compensated for by granting me an additional portion of land south of my lot. It was also agreed, to avoid controversies in the future when the street should be opened, that a portion of land equivalent to that taken for said street from my lot, would be given to me as compensation by taking a portion from the defendants' lot and the same was measured and fenced."

On cross-examination, he answered that he went to Mrs. Gómez' house, accompained by his counsel Lens; that she

delegated on Marrero to settle the matter; that he knows it because he saw Marrero in the company of the surveyor and they were measuring and it seems that he was the man on whom she relied, that he did not see her again; that he does not know what she did afterwards; that his estate was surveyed and it was found out that there was a deficiency of three "cuadros"; that his lot was delivered to him in accordance with the map; that that he thinks it was Mr. Marrero who delivered it; that it must be assumed that Marrero had a power of attorney from Doña Paca (Mrs. Gómez); that the agreement was entered into with the surveyors; that it was not entered into directly with Doña Paca.

His attorney, Mr. Lens, intervened and he answered as follows:

"Q. Watch out what he is asking you. When you talked with her, what did you agree? A. To set the boundaries. Q. And what else? A. After I talked to her it was with those in charge . . . . Q. What did you agree with her? A. That the boundaries be set. Q. And if a deficiency resulted? A. That she would give me a portion of her estate. We agreed that she would deliver to me the difference. Q. That was what you stipulated directly. When you refer to delivery, do you refer to the location? A. Yes, sir. Q. But the agreement was with her? A. Once the settlement of boundaries was made if there was any difference as to the area she agreed that it be compensated. Q. What? A. That it be delivered. Q. To whom? A. To me. Q. And then said lot was delivered to you? A. Yes, Sir. It had been made by the surveyors."

When examined again he testified:

"Q. Did she agree to deliver that same lot? A. She agreed that if there was a difference she had no objection. Q. Would Marrero attend to it? A. It was determined by the surveyors. Q. Was any agreement entered into as to amount and place? A. Yes, sir. As to the place and as to the fact that there was a deficiency. Q. Where was the lot they were going to give you located? A. Adjoining my lot. Q. Did she tell you? A. We agreed as to that. Q. Is it not true that you only agree with her as to the settling of boundaries? A. My claim was that there was some land missing from my estate."

It would suffice with said testimony of the defendant himself to sustain what we said regarding the insufficiency of the evidence, but let us see what the other witnesses testified to.

Surveyor Puig, the truthful person to whom the lower court had referred, said that, commissioned by the plaintiff, he had surveyed his estate, Nicomedes Marrero intervening as representative of "Florito's widow," the ancestor of the defendants; that he surveyed the estate of said ancestor, accompained by surveyor Lacomba, who represented the widow; that Lacomba's measurements showed an area of 19.76 acres, and his, 19.80, which is more or less the area stated in the title; that 0.77 acre was missing from plaintiff's estate, and to compensate for the deficiency he segregated the lot from the widow's estate, which is marked in the map, all this with Marrero's assent; the widow was not present at the settlement of the boundaries; he went to her house twice with the man who accompanied him in his work and who he laments is deceased; that she agreed to let him take from her estate what was missing from plaintiff's. The testimony is not clear as to the point of whether or not the deficiency was due to the land taken for the street.

Surveyor Lacomba denied that he had again made another survey following orders from defendants' ancestor and said that he did so on invitation of Mr. Puig, as he had already made a previous survey. He found out that the estate had the area stated in the title. He insisted that he had not been authorized by defendants' ancestor to take part in the survey or to give away any land. This witness' testimony appears as plaintiff's evidence. Nevertheless, it seems proper to clarify that at the end of this testimony he was asked by counsel for plaintiff and he answered as follows:

"Q. Who summoned you to appear in court? A. I was summoned by the court. Q. As a witness for which party? A. To testify as to the survey I had made with these gentlemen."

· Lastly, the third of the surveyors said that the plaintiff called him "in order that he survey the lot of land he had there because he had information to the effect that certain landmarks had been removed and upon making the survey I found that about 0 67 acre was missing, and I informed Mr. Antonio Marques about it and did not take part in anything else." He then said that Lacomba had taken part as representative of "the other party."

. With that evidence, we repeat, it is not possible to hold that the plaintiff is the owner of the lot in question. Only in Puig's testimony is there anything which tends to connect Mrs. Gómez personally with the cession of the lot after the settlement of boundaries was made. And said evidence is so imprecise that it fails to furnish the judge with a sufficient basis to declare as a proven fact the conveyance of the ownership of real property.

If the last conversation between surveyor Puig and Mrs. Gómez took place after the settlement of boundaries had been made and after the lot had been selected and marked in the map drawn, it is a striking fact that the surveyor failed to obtain Mrs. Gómez's conformity by having her sign her name at the foot of the map, which is the least that can be done in these cases.

So far we have only examined plaintiffs' evidence. From the evidence for the defendants we will refer only to the testimony of Marrero. He said in part:

"Q. Did you know Mrs. Francisca Gómez the widow of Oliveras? A. Yes, sir . . . Q. Did you ever have to do with any survey of her estate made by Arturo Puig? A. The one who did it was Lacomba. Q. Did he work together with Mr. Arturo Puig or not? A. She wanted a surveyor and I talked to surveyor Lacomba . . . Q. Did Lacomba have anything to do with Arturo Puig afterwards? A. Mr. Arturo . . . Q. What had Mr. Arturo to do with the estate of Doña Paca after her land was surveyed? A. The surveyor surveyed. Q. Who? A. Lacomba, and he said that the measures were exact and that is what he told Lens.

"Q. Have you at any time, acting for Doña Paca Gómez, conveyed anything to Mr. Antonio Marques of Arecibo? A. No, sir. Q. Never? A. No, sir. Q. Have you ever been an attorney in fact for that lady? A. No, sir. Q. What were your relations with her? A. A relative. Q. Did you go to her house? A. I used to go to her house to nurse her because she was sick. Q. Is it true that the she never granted any portion of her land? Yes, sir. Q. Are you sure? A. Yes, sir."

The judgment appealed from must be reversed and another entered, dismissing the complaint with costs against plaintiff including $200 for attorney's fees.